[Nos. A082385, A083003. First Dist., Div. Two. Dec. 15, 1999.]

LINDA L. QUALLS et al., Plaintiffs, Cross-defendants and Appellants, v. LAKE BERRYESSA ENTERPRISES, INC., et al., Defendants, Cross-complainants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.B. and III.C.

**COUNSEL**

Law Office of Daniel Chester and Daniel Chester for Plaintiffs, Cross-defendants and Appellants.

Kinman & Curry, Barry Alan Kinman and Marilyn P. Curry for Defendants, Cross-complainants and Appellants Lake Berryessa Enterprises, Inc., and Putah Creek Resort.

John J. Hartford and Alan M. Phillips for Defendants, Cross-complainants and Appellants Stanley Parks and Beverly Parks.

## Opinion

**HAERLE, J.—**

### I. Introduction

These consolidated appeals before us arise from a dispute over the placement of a new mobilehome at the Putah Creek Resort on Lake Berryessa. The Quallses, who owned a mobilehome placed on lot No. 149, contend that the Parks, who own the mobilehome on lot No. 148, placed their new mobilehome over the lot line dividing the two mobilehome spaces. Eventually, the Quallses brought suit against the Parks and Lake Berryessa Enterprises, Inc., and Putah Creek Resort (hereafter collectively Putah Creek). The defendants cross-complained. After an extensive trial, the trial court awarded the Quallses $5,000 for breach of contract by Putah Creek. Using an equitable cost-benefit analysis, the trial court declared a lot line that permitted the Parks' mobilehome to remain where it had been placed. The trial court also ruled that the Quallses and the Parks failed to prove their tort claims against each other. The trial court granted attorney's fees to the Quallses against Putah Creek and denied the Parks' request for attorney's fees from the Quallses.

Each party appeals a portion of the trial court's judgment. Putah Creek contends that the trial court erred in concluding that it breached its contract with the Quallses and in ruling that the County of Napa was not an essential party to the suit. The Quallses argue that the trial court erred in rejecting its trespass and nuisance claims against the Parks. The Parks urge that the trial court erred in denying their request for attorney's fees.

We will affirm the judgment in all respects.

### II. Factual and Procedural Background[1]

Putah Creek Resort is located on Lake Berryessa. Lake Berryessa Enterprises, Inc., runs Putah Creek Resort under a concession agreement with Napa County. That county, in turn, manages this (and other adjoining) land under an agreement with the federal government, which owns the land. Overall management of this federal land falls under the jurisdiction of the

---

[1]We have limited our discussion to the facts and procedural background relevant to the issues raised on appeal. Among evidence not summarized is that relating to the gun incident between the Quallses and Parks. The evidence relating to the location of the lot line between lots Nos. 148 and 149 is abridged, because Putah Creek concedes that substantial evidence supports the trial court's findings regarding the historical location of the lot line. Similarly, the dismissals and reinstatements of this case on appeal are not chronicled.

Bureau of Reclamation of the Department of the Interior (Bureau). (See Reclamation Development Act of 1974, Pub.L. No. 93-493, (1974) 88 Stat. 1486, 1974 U.S. Code Cong. & Admin. News, No. 1, §§ 601-602.)

The Bureau requires Putah Creek to comply with title 25 of the California Code of Regulations as part of its agreement to use federal land. Although the Bureau recognizes no grant of a property interest in the land of Putah Creek Resort, title 25 mandates the establishment of lot lines and sets forth minimum distances between mobilehomes. (Cal. Code Regs., tit. 25, §§ 1104, 1330.) However, since following the adoption of operational policy 14 by the Bureau on June 14, 1994, the federal government does not recognize that the California Mobilehome Residency Law applies to Putah Creek.

The Quallses are owners of a mobilehome located on lot No. 149 at Putah Creek Resort. They have occupied that space under an agreement with Putah Creek, since 1979. The agreements for the relevant time period provide for rental in exchange for "Mobilehome Space No. 149" and specified services, such as parking passes and garbage collection. The agreement specifies that the lot may only be used for recreational purposes and may not be used as a permanent residence. It also contains an attorney's fees clause.

In 1992, Putah Creek charged an employee, Dennis Dufault, with the job of reestablishing lot lines by finding existing markers where possible. Putah Creek undertook this task as a result of a Napa County inspection that informed Putah Creek that it was not in compliance with this portion of California Code of Regulations title 25. Dufault found an existing marker on the lakeside between lots Nos. 149 and 148, which was approximately where the Quallses understood the boundary to be. The lot line established by Dufault was approximately three feet from the mobilehome then occupying lot No. 148.

In September 1994, the Parks took possession of the mobilehome located on lot No. 148. They occupied the space pursuant to an agreement identical to the one between the Quallses and Putah Creek. When they took possession of their new space, they asked the resort to clarify the lot lines for that space.

In response to the request of the Parks, Putah Creek wrote a letter to the Quallses and the Parks on September 7, 1994, that set the boundary line halfway between the existing coaches. According to Vernon Smith, Putah Creek's manager, the response was based upon Putah Creek's inability to locate the markers placed by Dufault in 1992.

The Quallses were upset with this decision, because this lot line was closer to their mobilehome than the one established by Dufault in 1992.

They contacted Smith, explained the situation, and convinced him to come to the site and view the Dufault markers. After doing so, Smith "rescinded" his September 7 letter.

The boundary dispute continued between the Parks and the Quallses. In December 1995, the Parks moved a new mobilehome onto lot No. 148. The new mobilehome extends approximately four feet over the boundary line established by Dufault in 1992.

In January 1996, Putah Creek adjusted the lot line again to accommodate the Parks' new mobilehome and the three-foot setback requirement of California Code of Regulations title 25.

In October 1996, the Quallses filed a complaint against Putah Creek and the Parks. The complaint alleged four causes of action: (1) against Putah Creek for breach of contract as a third party beneficiary of Putah Creek's agreement with the Bureau; (2) breach of contract against Putah Creek; (3) trespass against the Parks; and (4) nuisance against Putah Creek and the Parks.

Putah Creek answered and cross-complained for declaratory relief regarding the location of the boundary and for indemnification. The Parks also answered and cross-complained for similar declaratory relief and for indemnification, and further stated several tort claims against the Quallses.

Putah Creek moved for summary judgment and judgment on the pleadings. The trial court denied both motions.

Trial before the court began on October 29, 1997. At the conclusion of the Quallses' case, Putah Creek moved for nonsuit. The trial court granted Putah Creek's motion with respect to the first cause of action. The trial court also granted the Quallses permission to amend their other claims to conform to proof.

After conclusion of the trial, the trial court issued a detailed statement of decision. The trial court specifically found that the lot line in existence "prior to, during and subsequent to, 1992" was the lot line urged by the Quallses. The trial court ruled that Putah Creek had breached its contract with the Quallses and awarded the Quallses $5,000. The trial court found against the Quallses on their trespass and nuisance claims and against the Parks on their tort claims. The trial court denied the various requests for indemnification. Employing equitable principles, the trial court declared the lot line to be four and a half feet from the mobilehome located on lot No.

148. Judgment consistent with the statement of decision was entered on February 2, 1998.

After hearing motions for attorney's fees, the court amended the judgment on March 30, 1998. The Quallses were awarded attorney's fees and costs to be paid by Putah Creek. The Parks were awarded costs to be paid by the Quallses, but their request for attorney's fees was denied.

Each party filed a notice of appeal. We consolidated the appeals.

### III. DISCUSSION

#### A. *The Quallses Were Licensees, Not Tenants.*

The threshold question raised in both the appeals of Putah Creek and the Quallses is whether the trial court correctly concluded that the Quallses were licensees, rather than tenants. We conclude that the trial court's ruling was correct.

"The precise meaning of any contract, including a lease [or license], depends upon the parties' expressed intent, using an objective standard. [Citations.] When there is ambiguity in the contract language, extrinsic evidence may be considered to ascertain a meaning to which the instrument's language is reasonably susceptible. [Citation.]" (*Golden West Baseball Co.* v. *City of Anaheim* (1994) 25 Cal.App.4th 11, 21 [31 Cal.Rptr.2d 378] (*Golden West Baseball*).) During the trial of this case, much extrinsic evidence was admitted without objection. "We review the agreement and the extrinsic evidence de novo, even if the evidence is susceptible to multiple interpretations, unless the interpretation depends upon credibility. [Citation.] If it does, we must accept any reasonable interpretation adopted by the trial court. [Citation.]" (*Id.* at pp. 22, fn. omitted.) We apply this standard of review to the agreements between Putah Creek and the Quallses.

The interpretation of an agreement to determine whether it is a lease, a license or another form of interest is often a subtle pursuit. At the most rudimentary level, "[w]hether an agreement for the use of property constitutes a license or a lease generally is determined by the nature of the possession granted. If the contract gives exclusive possession of the premises against all the world, including the owner, it is a lease; if it merely confers a privilege to occupy the premises under the owner, it is a license." (6 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 18:5, p. 14.)

While there are many factors that may be considered as part of this determination, one factor is dispositive here. Putah Creek's rights with respect to this land derived, and derived only, from its concession agreement with Napa County which, as noted earlier, had a management agreement

with the Bureau.[2] Not only are concession agreements generally construed to create only licenses (see, e.g., *Lee v. North Dakota Park Service* (N.D. 1977) 262 N.W.2d 467, 475 (*Lee*)), but Putah Creek's concession agreement does not purport to convey to it any sort of title or possessory interest. And the testimony at trial was consistent with an interpretation of Putah Creek's concession agreement as a license.

Further, Putah Creek could not transfer an interest in property greater than it possessed under its concession agreement. Thus, in *Lee*, the North Dakota Supreme Court reversed an inverse condemnation award to a resort operator who claimed that, because he had a document from a particular park district entitled "Lease," he had such an interest in the land. But, that court noted, the park district in question had only a license from the relevant federal agency and "Lee could not have obtained any greater rights than those given to [the park district] in the license even though the instrument between [the park district] and Lee was designated a 'lease.'" (*Lee, supra*, 262 N.W.2d at p. 474.)

Similarly, here Putah Creek had only a concession agreement with Napa County which, in turn, had a management agreement with the Bureau. The Bureau in turn was operating pursuant to a federal law (The Reclamation Development Act of 1974) which authorized it only to administer the federal land adjacent to Lake Berryessa and, in the course thereof, to "enter into . . . agreements with the State of California, or political subdivision thereof . . . for the management of recreation including the operation and maintenance of the facilities within the area." (Pub.L. No. 93-493, *supra*, 88 Stat. 1486, 1974 U.S. Code Cong. & Admin. News, No. 1, §§ 601-602.) In short, nothing in any of the underlying documents or law suggests that Putah Creek had any sort of title or possessory interest to convey, even if it wanted to.

The Quallses ignore this fundamental impediment to their argument and assert that their agreement with Putah Creek should be interpreted as a lease, because the agreement (1) was not terminable at will and (2) granted them exclusive possession of the mobilehome space. The first contention is easily answered: "The fact that the license is not terminable at will or is coupled with an interest does not destroy its character as a license or convert it into a lease." (6 Miller & Starr, Cal. Real Estate, *supra*, § 18:5, at p. 13.)

The second contention also does not further the Quallses' claim. The agreement clearly describes the allowable uses of the mobilehome space and limits the amount of time the space can be occupied in accordance with the

---

[2] The latter agreement is not part of our record.

recreational uses permitted. Moreover, even the Quallses acknowledged that the space was subject to use by the public for ingress and egress to the lake. As such, the agreement more closely resembles the interest described in *Golden West Baseball* as an irrevocable license or easement than it does a leasehold. (*Golden West Baseball, supra,* 25 Cal.App.4th at pp. 32-36.)[3]

In its appeal, Putah Creek contends that, if we conclude the trial court correctly found that the Quallses' interest was a license, we must conclude as a matter of law that the trial court erred in awarding the Quallses damages for breach of contract resulting from movement of the lot line between the Quallses' and the Parks' spaces. In so doing, however, it ignores the lesson of one of its primary authorities, *Golden West Baseball,* to wit: "The agreement here granted certain rights and imposed certain duties on the parties. Our task is to determine the scope of these rights and duties. To say we cannot do so without first determining whether the agreement is a lease, an easement, or some other interest in land ignores modern commercial realities. The contractual relationship between the parties must be analyzed based on the evidence and findings without regard to its classification under traditional common law concepts." (*Golden West Baseball, supra,* 25 Cal.App.4th at pp. 36-37, fn. omitted.)

We believe this is a sound observation and in accordance with the increasing creativity of contracts that blur the distinctions between interests. In other words, the contract between the parties may contain terms that give greater rights to a contracting party than would be accorded by the common law, such as, for example, an irrevocable license or the incorporation of specific terms relating to termination.

Moreover, "[e]asements and licenses may, but need not, have definite boundaries other than the boundaries of the servient tenements themselves." (*Colvin* v. *Southern Cal. Edison Co.* (1987) 194 Cal.App.3d 1306, 1312 [240 Cal.Rptr. 142], overruled on other grounds in *Ornelas* v. *Randolph* (1993) 4 Cal.4th 1095, 1109 [17 Cal.Rptr.2d 594, 847 P.2d 560].) And, a key point here, "[a] licensee, as such, is not entitled to possession against third persons. The license[, however,] may give him such possession [citation] . . . ." (*O'Shea* v. *Claude C. Wood Co.* (1979) 97 Cal.App.3d 903, 911-912 [159 Cal.Rptr. 125], overruled on other grounds by statute.)

We therefore conclude the trial court was correct in its rulings that (1) the interest the agreement gave the Quallses was a license and (2) such a license

---

[3]The Quallses contend in their cross-appeal that, if the trial court erred, they are entitled to reversal of the judgment against them on their causes of action against the Parks for trespass and nuisance. They do not, however, urge that they could prevail on those causes of action if the trial court's ruling was correct. Accordingly, we do not reach this question and affirm that portion of the judgment.

agreement could be enforced by them via a breach of contract action. ■ We also conclude that, for the reasons which follow, the trial court properly interpreted and enforced the agreement.

The written agreement between the Quallses and Putah Creek is for use by the former of "Mobilehome Space No. 149." Among the facilities and services to be provided to the permitee is "Mobilehome space." Putah Creek urges that the term must be construed to only refer to the "physical space occupied by the mobilehome itself and not to the land on which it sits or to lot lines. . . ." The problem with this interpretation is that it is wholly unreasonable. It is undisputed that Putah Creek is required to conform to California Code of Regulations, title 25, which requires both lot lines and minimum setbacks between mobilehome spaces. (Cal. Code Regs., tit. 25, §§ 1104, 1330.) Thus, the term "Mobilehome Space No. 149" must include *at a minimum* land sufficient to satisfy minimum setback requirements.

Furthermore, the testimony of the parties themselves, while varying as to where the lot line should be located, uniformly acknowledged that some demarcation exists between spaces at Putah Creek. Indeed, Putah Creek undertook to reestablish lot lines in 1992. The most reasonable construction of the term "Mobilehome Space No. 149" would be with reference to the lot lines so established. This interpretation is buttressed by the fact that the 1992 lot line is consistent with the Quallses' historical use of "Mobilehome Space No. 149." (Cf. *Colvin* v. *Southern Cal. Edison Co., supra,* 194 Cal.App.3d at p. 1312 [discussing construction of a nonspecific easement].)

Accordingly, we reject Putah Creek's interpretation of the agreement. We conclude, instead, that the trial court properly interpreted it and we thus affirm the judgment for breach of contract in favor of the Quallses.

B., C.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## IV.  DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to the Quallses.

Kline, P. J., and Ruvolo, J., concurred.

The petition of defendants, cross-complainants and appellants for review by the Supreme Court was denied March 22, 2000.

---

*See footnote, *ante,* page 1277.